# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MICHAEL THOMAS VIRGIN,**

        **Plaintiff,**

**-vs-**                               **Case No.  6:11-cv-1165-Orl-DNF**

**MICHAEL ASTRUE, Commissioner of
Social Security,**

        **Defendant.**

_____

## OPINION AND ORDER

Claimant, Michael Thomas Virgin seeks judicial review of the final decision of the Commissioner of Social Security Administration denying his claim for Disability and Disability Insurance Benefits. The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions. For the reasons set out herein, the decision of the Commissioner is AFFIRMED pursuant to §205(g) of the Social Security Act, 42 U.S.C. §405(g).

**I.**    **Social Security Act Eligibility, Procedural History, and Standard of Review**

    **A.**    **Social Security Act Eligibility**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making Plaintiff

unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § § 404.1505-404,1511.

### B.      Procedural History

On March 05, 2007[1], the Plaintiff filed an application for a period of Disability Insurance Benefits ("DIB"), alleging disability beginning March 31, 2005. [Tr. 120-125]. The agency denied the Plaintiff's claim initially. [Tr. 70]. The Plaintiff's request for reconsideration was also denied and a Request for Hearing was timely filed. [Tr. 83]. A hearing was held on September 24, 2009, before Ruben Rivera, Jr., Administrative Law Judge ("ALJ"). [Tr. 30]. The ALJ's decision, dated October 29, 2009, denied Plaintiff's request for DIB. [Tr. 15-29]. The Appeals Council denied Plaintiff's Request for Review [Tr. 11] on May 18, 2011. [Tr. 1-5]. The Plaintiff Appeals pursuant 42 U.S.C. §405(g).

### C.      Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g). The Court must, "review the Commissioner's decision to determine if it is supported by substantial evidence and based on proper legal standards." *Crawford v. Comm'r Of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (citing *Lewis v. Callahan,* 125 F.3d 1436, 1439 (11th Cir.1997))."Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion." *Id.* "Even if the evidence preponderated against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Crawford v. Comm'r Of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)

---

[1]The Commissioner's Memorandum dates the filing of the application as March 23, 2007, citing the Disability Determination Transmittal, [Tr. 70]. (Doc. 15 p. 1). However, the application itself is dated March 5, 2007. [Tr. 124].

(citing *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.1990)). The Court must, "view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Chester v. Bowen,* 792 F.2d 129, 131 (11th Cir.1986)). However, the Court, "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)).

The ALJ must follow a five step sequential evaluation process for determining whether an individual is disabled.  20 C.F.R. §§ 404.1520, 416.920. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. If the claimant is doing any substantial gainful activity then he is not disabled. 20 C.F.R. § 404.1520(a)(4)(I).

The second step considers the medical severity of the impairment: if there is not a severe medically determinable physical or mental impairment, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii).

The third step also considers the medical severity of the impairment. If the claimant has an impairment that meets or equals one of the listings and meets the duration requirement, the claimant will be found to be disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

The fourth step is assessing the residual functional capacity of the claimant, and the claimant's past relevant work.  If the claimant can still do his past relevant work then he will not be found disabled. 20 C.F.R. § 404.1520(a)(4)(iv).

The fifth step considers the residual functional capacity as well as the age, education, and work experience of the claimant to see if he can make an adjustment to other work.  If the claimant can make an adjustment to other work then the claimant will not be found disabled. 20 C.F.R. §

404.1520(a)(4)(v). The Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287 (1987); *see also Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001). Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner. *Doughty*, 245 F.3d at 1278 n.2.

I.    **Review of Facts**

       A.    **Background Facts**

       The Plaintiff was thirty-three (33) years old at the time of his hearing. [Tr. 34] He has a ninth grade education but has a general equivalency diploma. [Tr. 35]. In the past he worked as an assembler, a plumber, and a title clerk. [Tr. 132]. The Plaintiff stopped working on March 31, 2005, due to a lumbar fusion, spinal stenosis, lumbar radiculopathy, and a torn ACL in the left knee. [Tr. 143].

       B.    **The ALJ's Findings**

       At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since March 31, 2005, and that the Plaintiff met the insured status requirement for the Social Security Act through December 31, 2009. [Tr. 20].

       At step two, the ALJ determined that, based on the medical record, the Plaintiff had the following severe impairments: Status post L4-S1 lumbar fusion, osteoarthritis, bilateral knees, and obesity. [Tr. 20]. The ALJ also determined that the Plaintiff's impairments of adjustment disorder with depressed mood and panic disorder without agoraphobia were minimal limitations to the Plaintiff's ability to perform basic mental work tasks and were accordingly not severe. [Tr. 21-22]. In order to come to this determination the ALJ considered four broad functional areas set out in the disability

-4-

regulations regarding mental disorders: (1) Daily living, where the ALJ determined the Plaintiff to have a mild limitation; (2) Social functioning, where the ALJ determined the Plaintiff to have a mild limitation; (3) Concentration, persistence, or pace, where the ALJ determined the Plaintiff to have a mild limitation; and (4) Episodes of decompensation, where the ALJ found that the Plaintiff had no such episodes. [Tr. 22].

In the third step, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 22]. The ALJ determined that there was no medical evidence of herniation, nerve root compression, motor loss, sensory loss, or reflex loss as specified by Listing 1.04 Disorders of the Spine. [Tr. 22-23]. The ALJ also found no opinion offered by an expert designated by the Commissioner of Social Security that supported a contrary finding. [Tr. 23].

At the fourth step, the ALJ found that the Plaintiff had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b) with an occasional ability to climb, balance, stoop, kneel, crouch, or crawl. [Tr. 23]. The ALJ concluded that although the Plaintiff may have had some restrictions, there was no sufficient evidence to preclude him from "all types and degrees of work activities." [Tr. 26]. The ALJ considered "all symptoms, and the extent to which these symptoms can reasonably be accepted as consistent with objective medical evidence and . . . opinion evidence . . . ." [Tr. 23]. The ALJ considered the totality of the evidence and accorded the appropriate weight to the opinions of both State Agency and private physicians. [Tr. 27]. The ALJ then determined that because the Plaintiff's previous work experience was "heavy in nature" (plumber, boat repairman), he was unable to perform past relevant work. [Tr. 28].

-5-

In the final step, the ALJ found that considering the Plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform." [Tr. 28]. The Plaintiff's transferability of job skills would not be an issue according to the ALJ's findings because the Plaintiff's previous relevant work had been unskilled. [Tr. 28]. Along with the considerations above, the ALJ also considered the Medical-Vocational guidelines of 20 C.F.R. Part 404, Subpart P, Appendix 2, which directed the ALJ to a finding of "not disabled" as per Medical-Vocational Rule 202.20. [Tr. 28]. The ALJ concluded that the Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. [Tr. 28].

### C.    Medical Evidence

On October 30, 2004, the Plaintiff went to the office of Dr. Richard Hynes but was examined by Damian Velez, his physician assistant. [Tr. 295-96]. The Plaintiff told the examiner that he had a ten year history of low back pain that had gotten progressively worse. [Tr. 295]. He complained of numbness, tickling, and pain, which he described as a 7-8 out of 10, stating that it radiated down his right leg all the way to his big toe. [Tr. 295]. A CT scan revealed Grade I spondylolisthesis, broad disk protrusion, and a degenerative collapse at L4-5 and L4-S1. [Tr. 295]. He had a right disk protrusion at L5-S1, which was consistent with his radiculopathy. [Tr. 295]. Mr. Velez, the physician assistant, diagnosed the Plaintiff with (1) a Grade I L4-5 spondylolisthesis; (2) broad disk protrusion and degenerative disk disease with mechanical back pain and right L5 radiculopathy; and (3) left knee pain, ruling out intrinsic pathology. [Tr. 295].

The Plaintiff visited Jeffrey O'Brien, M.D. on November 11, 2004. He revealed that he had suffered an injury in a motor vehicle accident on April 27, 2003. [Tr. 200]. He had surgery on his left arm and left femur. [Tr. 200]. His left knee pain, which occurred mostly during movement of the left

knee, had gotten more severe and Dr. O'Brien noted popping and cracking sounds. [Tr. 200]. Dr. O'Brien diagnosed a left ACL tear. [Tr. 202].

On March 24, 2005, the Plaintiff returned to Dr. Hynes. He received epidural injections, but Dr. Hynes noted that the Plaintiff's pain kept recurring. [Tr. 285]. The Plaintiff described his pain at this time as a 6 out of 10. [Tr. 285]. He was still working at this time but Dr. Hynes said that the Plaintiff could not function without taking pain medicine. [Tr. 285]. On examination, Dr. Hynes discovered that the Plaintiff walked with a 5 degree forward flexed plane, got terrific pain at the extended position, and that his straight leg raising was at about 40 degrees. [Tr. 285]. He also noted that the Plaintiff had gained a lot of weight due to lack of exercise. [Tr. 285]. The doctor diagnosed the Plaintiff with (1) severe spinal stenosis and mechanical instability at L4-5 as well as (2) lateral recess stenosis and neural foraminal stenosis at the right L5-S1 with right clinical L5-S1 radiculopathy. [Tr. 285]. Dr. Hynes recommended further testing and surgical intervention. [Tr. 285].

On April 4, 2005, the Plaintiff visited with Anne Gregg, P.A. for Anthony Afong, M.D., and complained of increased pain. [Tr. 283]. Ms. Gregg reported bruising and minimal redness, as well as tenderness over the lumbar spine, "particularly to the left in the area of the injections." [Tr. 283]. Ms. Gregg also noted that the Plaintiff walked with a forward flexed stance and antalgic gait. [Tr. 283]. The report states that there was  (1) increased pain status post diskogram; (2) lateral recessed stenosis and neural foraminal stenosis right L5-S1 with right clinical L5-S1 radiculopathy; and (3) mechanical instability of L5-4 with severe spinal stenosis. [Tr. 283]. During this visit, Ms. Gregg released the Plaintiff with light duty restrictions to allow for frequent reaching above the shoulders, reaching below the knees, kneeling and squatting, pushing and pulling, occasional climbing, lifting

to a maximum of 50 pounds, and occasional overhead lifting. [Tr. 283]. Ms. Gregg also noted that the Plaintiff could do constant standing and seating. [Tr. 283].

On April 19, 2005, Lizamar Korfhage, PA, placed the Plaintiff on short-term disability. [Tr. 278-79]. Mr. Korfhage noted that the Plaintiff ambulated with a forward flexed stance and antalgic gait, had tenderness in the low back (greater in the right than the left side), and had a diminished range of motion with respect to a right lateral bend and extension greater than 10 degrees. [Tr. 278-79]. During this visit, Mr. Korfhage noted that the Plaintiff had lumbalgia with right lower extremity radiculopathy secondary to multilevel degenerative disk disease and neural foraminal stenosis. [Tr. 278]. The document restricts the Plaintiff to do no bending, stooping, twisting, climbing, or crawling motions and adds a weight limitation of lifting no more than 5-10 pounds. [Tr. 278].

On May 10, 2005, Mr. Korfhage notes that the Plaintiff was having disputes with his insurance over a planned operation to fuse his L4-S1. [Tr. 277]. At this time the Plaintiff's pain was a 7-9 out of 10, he ambulated in an upright stance and antalgic gait, and continued to be tender at the lumbar paraspinal musculature and the lumbosacral junctional region. [Tr. 277]. Mr. Korfhage noted a diminished range of motion with an extension at greater than 10 degrees and right lateral bend. [Tr. 277]. The Plaintiff's right lower extremity had diminished sensations at L4-S1. [Tr. 277]. Deep tendon reflexes at the patella were 2+ and 1+ at the Achilles. [Tr. 277]. Mr. Korfhage noted that planning for a 360-degree fusion at L4-S1 levels would continue and that the Plaintiff would continue with a no work status and the same restrictions as noted in the paragraph above. [Tr. 277].

The Plaintiff underwent spinal surgery to fuse levels L4-S1 in August of 2005 [Tr. 258] and went in for an evaluation visit with Mr. Korfhage on September 26, 2005. [Tr. 271].Mr. Korfhage noted that the Plaintiff had undergone 360 degree fusion surgery from L4 through S1 where an anterior

-8-

pyramid plate was installed. [Tr. 271]. His pain level at this time was 8-9 out of 10, but Mr. Korfhage noted that this may be more along the lines of post-operative incision pain. [Tr. 271]. Mr. Korfhage also noted that the Plaintiff ambulated into the exam room in an upright stance, with appropriate gait, and without the use of an assistive device other than his LSO brace. [Tr. 271]. He had tenderness in his lumbar paraspinals, though this was along the lines of incision. [Tr. 271].

On February 15, 2006, the Plaintiff returned to Mr. Korfhage for another followup visit, focused on medications management. [Tr. 258]. Mr. Korfhage noted that the Plaintiff continued to have lumbalgia and radiculopathy at the lower extremities, which was becoming an issue with physical therapy. [Tr. 258]. The Plaintiff was taking Percocet at this time. [Tr. 258]. Mr. Korfhage noted that the Plaintiff's healing process would take about 9 to 12 months, with monitoring of the condition being necessary for pain management. [Tr. 258].

The Plaintiff again saw Mr. Korfhage for medication management. [Tr. 440]. During the examination, the doctor noted continued diminished strength in his right lower extremities. [Tr. 440]. The Plaintiff's patellar reflexes and Deep Tendon Reflexes were at 1+, but absent at the Achilles and the right lower extremities. [Tr. 440]. A positive straight leg raise reproduced symptoms at the right lumbar spine region, radiating down to the hip, buttock, and lower right extremity. [Tr. 440]. Mr. Korfhage's impression at this time was of lumbalgia with right lower extremity radiculopathy, status post surgical L4-S1 fusion. [Tr. 440].

A CT scan of the lumbar spine, conducted on March 31, 2006, showed post surgical changes and a mild annular disk bulge at L3-4, contributing to trace central canal stenosis. [Tr. 438]. No appreciable disk fragment or neural foraminal compromise were noted. [Tr. 438]. Some postsurgical changes and a minor disc bulge were noted at L4-5, occurring with some eccentricity to the left of the

-9-

midline. [Tr. 438]. The disc showed signs of calcification and minimal central canal stenosis and maybe mild left lateral recess compromise. [Tr. 438]. No significant central canal or neural foraminal compromise was apparent. [Tr. 438].

On May 5, 2006, the Plaintiff had a CT myelogram that showed mild rotatory dextroscoliosis of the lumbar spine. [Tr. 206]. The radiologist's impression was as follows:

> 1. Residual/recurrent versus scar tissue in a right paracentral location at L4-5 intraverbal disk level. The results in mild mass-effect on the anterior aspect the thecal sac without significant canal stenosis. There is also mild right neruroforaminal narrowing. The remaining intervertebral disk levels appear widely patent without evidence of significant canal stenosis or neuroforaminal narrowing at other levels. There is no vertebral body fracture or subluxation. There is no distal cord or cauda equina compression.
> 2. Status post anterior and posterior fusions from L4 through S1 as described above without evidence of harware loosening or failure.

[Tr. 206-7]. The scan showed no loosening or failure of the hardware used for the L4-S1 fusion. [Tr. 206].

The Plaintiff had an MRI of his thoracic spine taken on July 25, 2006. [Tr. 435]. The MRI revealed a moderate central-right paracentral herniated nucleus pulposus abutting the anterior aspect of the cord at T8-9. [Tr. 435]. The thoracic cord at other levels was normal in appearance and evidenced no significant disc bulge, herniation, or spinal stenosis. [Tr. 435]. However, the MRI did reveal moderate disc desiccation. [Tr. 435].

On November 15, 2006, the Plaintiff was reexamined by Mr. Korfhage. [Tr. 245-46]. His Impression notes (1) Lumbalgia with lower extremity radiculopathy, increased intensity status post L4 to S1 fusion; and (2) Adjacent segment disk disease. [Tr. 245]. Mr. Korfhage also noted that the Plaintiff needed a follow-up visit to discuss continued care and the need to address the level above the L4 to S1 fusion. [Tr. 245]. The Plaintiff was advised to continue in a sedentary type position and avoid

repetitive bending, stooping, twisting, climbing, or crawling motions, adding a weight limitation of no more than 20 to 25 pounds with an occasional maximum of 40 pounds "with sitting, standing and ambulating as tolerated." [Tr. 245-46].

The Plaintiff followed up with Dr. Hynes on December 5, 2006. [Tr. 244]. The doctor noted that the Plaintiff was feeling better. [Tr. 244] The Plaintiff had gained 60 pounds and felt increased discomfort when he tried to exercise. [Tr. 244]. The doctor recommended the Plaintiff not return to heavy work but could return to a light duty position. [Tr. 244]. The doctor noted that the Plaintiff was moving off of the narcotic medications he had been taking and was learning to tolerate the residuals of discomfort. [Tr. 244].

The Plaintiff visited Mr. Korfhage on March 15, 2007. Mr. Korfhage noted that the Plaintiff was doing well weaning off his medications and that he was ready to decrease his dosing. [Tr. 242]. The Plaintiff had diminished sensations on his L4-5 distribution of the right lower extremity with an overall strength of 5 out of 5 and symmetric deep tendon reflexes. [Tr. 242]. Mr. Korfhage's impression noted Lumbalgia with lower extremity radiculopathy, intermittent in nature, status post L4 to S1 fusion. [Tr. 242]. The doctor prescribed Percocet 10/325 mg. [Tr. 242].

In a Disability Report that the Plaintiff completed on April 16, 2007, he indicated that he was able to prepare simple meals, perform light household chores, take short showers, drive for short distances, and shop for light groceries. [Tr. 151-52]. The Plaintiff also reported that he could not do laundry, yard work, or certain hobbies such as riding his motorcycle and fishing. [Tr. 151-52]. Plaintiff had stopped attending physical therapy because his insurance had run out. He was using a TENS unit, a vibrating pillow, and heat to try and relieve the various pains he reported. [Tr. 151]. The Plaintiff reported taking Celebrex and Percocet. [Tr. 150].

-11-

On April 19, 2007, the Plaintiff did a followup visit with Anne C. Gregg, PA, for medication management. [Tr. 319]. Ms. Gregg noted that the Plaintiff had reached a plateau in his pain. [Tr. 319]. The Plaintiff had by this point discontinued physical therapy, explaining that he was not getting better and that it was beginning to bother him. [Tr. 319]. He continued to have pain down his legs. [Tr. 319]. His physical examination yielded normal ambulation with an upright stance, nonantalgic gait and ability to transfer independently. [Tr. 319]. He was otherwise unchanged from his last visit to Mr. Korfhage. [Tr. 319].

On May 17, 2007, Mr. Korfhage reported that the Plaintiff's low back pain and lower extremity radiculopathy continued with a pain rating of 4-5 out of 10. [Tr. 318]. The Plaintiff complained of migraine headaches and inquired about medicine samples to control them. [Tr. 318]. The doctor noted tenderness at the lumbar paraspinals, a positive straight leg raise test, and diminished sensations at the along the L4 and L5 distributions of the lower right extremities. [Tr. 318]. The Plaintiff was told to continue taking Percocet and was given a trial of Frova 2.5mg for his headaches. [Tr. 318].

The Plaintiff reported continued low back pain and intermittent radiculopathy again to Mr. Korfhage on August 10, 2007. [Tr. 315]. His migraines also continued and the Frova he was given was ineffective because he had not taken it appropriately. [Tr. 315]. He had more samples of Frova to try, and the doctor noted that if it was effective, he would be prescribed the medicine. [Tr. 315]. He was also provided with samples of Celebrex. [Tr. 315]. The Physical Examination on this visit yielded the same results as the previous examination by Mr. Korfhage. [Tr. 315].

In a Function Report filled out on October 5, 2007, the Plaintiff reported that he struggled to prepare meals and was limited in his ability to do household chores, drive, and shop. [Tr. 168-69]. The

Plaintiff also noted that he went fishing with his father about once a month and went to his nephew's soccer games once per week. [Tr. 170-71]. He struggled to walk more than 30 minutes, squat, bend, stand, sit for long periods, and kneel. [Tr. 171]. The Plaintiff reported that he did not use a cane, walker, wheelchair, or brace/splint at this time. [Tr. 173].

On October 9, 2007, Dr. Hynes completed a form for the Office of Disability Determinations. [Tr. 320]. The doctor identified intact fine motor skills with no motor deficits. [Tr. 320]. Dr. Hynes also reported decreased Sensation in the L4-S1 distribution with a strength of 5 out of 5, antalgic upright gait, positive deep tendon reflexes at the patella, absent at the achilles, and a positive straight leg raise. [Tr. 320].

The Plaintiff visited with Dr. Nitin Hate on October 15, 2007 for a consultative evaluation by the Office of Disability Determinations. [Tr. 321]. The doctor noted that the Plaintiff would have difficulty with strenuous activities, repeated stooping, squatting and lifting weights. [Tr. 323]. The Plaintiff reported neck pain, low back pain, left knee pain, and numbness of both hands that was more noticeable on the right. [Tr. 321]. He also reported mid thoracic and cervical spine pain. [Tr. 321]. The Plaintiff also reported to Dr. Hate that he suspected Carpal Tunnel Syndrome. [Tr. 321]. The doctor reported positive Tinel sign on the right side and found evidence of Carpal Tunnel Syndrome. [Tr. 322]. The doctor found no evidence of thenar atrophy. [Tr. 322]. The doctor further found that the Plaintiff's gait was normal; however, his toe and heel walking and squatting were somewhat limited. Plaintiff had diminished touch and pinprick sensations at his right hand median distribution, and restricted range of motion at the thoracolumbar region. [Tr. 322]. The doctor noted in his Impression that (1) the Plaintiff probably had more mechanical pain in the spine and recommended nerve conduction velocity studies to determine the nature of the Plaintiff's problem more specifically; (2)

the Plaintiff needed surgery at the left knee; and (3) there was evidence of right sided Carpal Tunnel Syndrome and the Plaintiff would probably benefit from surgery and recommended wearing night splints. [Tr. 323]. Dr. Hate commented that the Plaintiff would have difficulty in performing strenuous activities, repeated stooping, squatting, and lifting weights. [Tr. 323]. Finally, the doctor recommended weight reduction, physical therapy, and the use of splinting to help with the Carpal Tunnel until the Plaintiff could find appropriate medical care. [Tr. 323].

The Office of Disability Determinations referred the Plaintiff to William Eyring, III, Psy. D. for a psychological evaluation that took place on October 23, 2007. [Tr. 325]. The doctor's prognosis was poor without treatment and fair with treatment. [Tr. 327]. Dr. Eyring recommended psychiatric and psychological treatment of anxiety and depressive symptoms and opined that these symptoms could impair the Plaintiff's ability to obtain and maintain gainful employment. [Tr. 327]. The doctor's diagnosis was for a pain disorder related to psychological disorders and the back/knee pain as well as a panic disorder with no Agoraphobia and an adjustment disorder with depressed mood. [Tr. 327].

On November 3, 2007, Loc Kim Le, M.D., completed a Physical RFC Assessment. [Tr. 357]. Dr. Le is a non-examining physician employed by the state agency. [Tr. 357]. The doctor opined that the Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday, sit with normal breaks for a total of about 6 hours in an 8-hour workday, and push/pull in a matter unlimited except as limited by the abovementioned lifting and carrying. [Tr. 357]. He also opined that the Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. [Tr. 358]. No manipulative, visual, communicative, or environmental limitations were established through the medical evidence provided to the doctor. [Tr. 359-60]. Dr. Le further found that the Plaintiff's

symptoms were attributable to the latter's medically determinable impairments, that the severity and duration of the symptoms were disproportionate to the expected severity or duration of the Plaintiff's medical impairments, and that the Plaintiff was partially credible. [Tr. 361].

Theodore Weber M. Div., Psy. D. prepared a Psychiatric Review Technique form on November 6, 2007. [Tr. 340]. Dr. Weber is a non-examining state agency consultant. The doctor opined that the Plaintiff's impairment was not severe and that it did not significantly affect functioning. [Tr. 340]. Dr. Weber stated that any limitations in the Plaintiff's functioning appeared to be attributable to his physical condition. [Tr. 340].

The Plaintiff visited  Dr. Hynes on December 4, 2007. [Tr. 422]. The Plaintiff complained of low back pain. [Tr. 422]. The doctor noted that the Plaintiff had a pending followup visit with Dr. O'Brien for a right knee ACL tear and that his lumbalgia and lower extremity radicular symptoms continued. [Tr. 422]. At this point his pain was a 6 out of 10. [Tr. 422]. The doctor noted tenderness of the lumbar paraspinals, more tender on the right side, and continued positive straight leg raise only on the right lower extremity with weakness on extension and flexion. [Tr. 422]. His deep tendon reflexes remained at 1+ at the patella and absent at the Achilles. [Tr. 422]. The doctor's Impression noted (1) lumbalgia with a history of L4 to S1 fusion; (2) Stable T8-9 right paracentral HNP; and (3) Left knee pain with history of questionable ACL tear. [Tr. 422].

On December 18, 2007, the Plaintiff visited with Dr. O'Brien. [Tr. 403]. The Plaintiff complained of lateral knee pain. [Tr. 403]. He reported that he had trouble with stairs, that his knee grinded and gave way, and that the knee brace he had previously used no longer worked. [Tr. 403]. The doctor noted that x-rays were taken at the office. [Tr. 403]. Dr. O'Brien recommended that the Plaintiff should have his left knee hardware removed. [Tr. 406]. The problematic hardware was

removed on January 18, 2008; Dr. O'Brien noted removing two screws from Plaintiff's left knee without any reported complications. [Tr. 390].

The Plaintiff visited with Joseph Brooks, M.D. on February 29, 2008, complaining about low back and left knee pain. [Tr. 417]. His pain was reportedly a 5 or 6 out of 10. [Tr. 417]. He told Dr. Brooks that the Percocet was too strong and making him feel "spaced out." [Tr. 417]. The doctor's physical examination revealed lower back tenderness, especially at the right paravertebral area and no focal spasms. [Tr. 417]. The Plaintiff's straight leg raise produced back pain but not significant leg pain. [Tr. 417]. He had +1 edema in the lower left extremity and some swelling around the anterior left knee with an antalgic gait, favoring the left side. [Tr. 417]. The doctor diagnosed chronic low back pain status post L4-S1 lumbar fusion and left knee pain status post recent hardware removal. [Tr. 417].

On March 18, 2008, and March 25, 2008, the Plaintiff visited with Dr. O'Brien and reported moderate post-operative pain in the left knee. [Tr. 382, 384]. The Plaintiff reported that the pain increased when he used the stairs. [Tr. 384]. The doctor reported increased swelling and pain in the left knee. [Tr. 382]. He diagnosed knee tear at the medial meniscus of the left knee. [Tr. 382]. The Plaintiff consented to a left knee arthroscopy with meniscetomy, a possible osteochondral repair with surgery. [Tr. 383].

On July 28, 2008, the Plaintiff visited Dr. O'Brien again, complaining of right knee pain that had been lasting for two or three weeks. [Tr. 375]. The pain reportedly occurred after prolonged walking and standing and while the Plaintiff reported no popping or clicking, he did report that the knee gave way. [Tr. 375]. A day after, on July 29, 2008, the Plaintiff had an ultra-high resolution MRI scan of the right knee. [Tr. 373]. It revealed intact cruciate ligaments and a marked abnormal signal within the medial femoral condyle. [Tr. 373]. The medial femoral condyle also showed avascular

-16-

necrosis as did the lateral femoral condyle, but to a lesser extent. [Tr. 373]. The scan also showed a moderately large joint effusion and edema within the popliteus muscle, where the scan also revealed a small ganglion cyst. [Tr. 373]. There was also a cyst posterior to the root of the posterior horn of the medial meniscus. [Tr. 373].

In a pain management visit with Dr. Brooks on August 1, 2008, the Plaintiff reported low back pain and bilateral knee pain with increased right knee pain. [Tr. 413]. The doctor reported that Dr. O'Brien had diagnosed a torn meniscus in the right knee. [Tr. 413]. The Plaintiff had osteoarthritis at both knees and ambulated with an antalgic gait that favored the right side. [Tr. 413]. The doctor diagnosed (1) chronic low back pain with a history of L4-S1 fusion; and (2) bilateral knee osteoarthritis with meniscal tear on the right. [Tr. 413].

On January 27, 2008, the Plaintiff reported a pain of 5 out of 10 to Dr. Brooks. [Tr. 408]. His radicular pain returned and on exam, the doctor noted tenderness in the low back with a gait favoring his right side with no edema. [Tr. 408]. Dr. Brooks diagnosed (1) chronic low back pain; (2) right foot pain consistent with lumbar radiculitis in a L4 distribution; and (3) bilateral knee osteoarthritis and meniscal tears. [Tr. 408].

The Plaintiff returned to Dr. Brooks for pain management on July 2, 2009. [Tr. 407]. He rated his pain as a 6 out of 10 and reported that he was taking Celebrex and Percocet along with some Tramadol, which the Plaintiff reported as being effective. [Tr. 407]. He also reported foot pain at the right toe, heel, and sole. [Tr. 407]. On exam, the doctor noted tenderness of the lumbar spine. [Tr. 407]. The doctor also reported the Plaintiff ambulating with gait favoring the right side and no edema. [Tr. 407]. The doctor diagnosed (1) chronic low back pain; (2) right foot pain consistent with lumbar radiculitis in the L4-5 distribution; and (3) bilateral knee pain secondary to osteoarthritis with left knee

meniscal tear. [Tr. 407]. The treatment suggestion consisted of a right L5 transforaminal epidural steroid injection with fluoroscopy and renewal of the Plaintiff's Percocet and other medications. [Tr. 407].

On July 25, 2009, Dr. Brooks completed a Physical Restrictions evaluation of the time ranging from 2004 to 2009. [Tr. 443]. Dr. Brooks restricted the Plaintiff to (1) 15 continuous minutes and 2-3 cumulative hours of sitting time in an average 8 hour period; (2) 10 continuous minutes and 1 cumulative hour of time standing in an 8 hour period; (3) 5-10 continuous minutes and 1 cumulative hour of time walking in an average 8 hour period; and (4) 3 hours of time sitting and standing in an 8 hour period. [Tr. 443]. The doctor noted that the Plaintiff's physical capacities did not vary significantly from day to day. [Tr. 443]. The doctor further restricted the Plaintiff to (1) 10 minutes of lifting and carrying objects up to 5 pounds and (2) 1-2 minutes carrying from 10 to 20 pounds during an 8 hour period. [Tr. 443]. The doctor noted that the Plaintiff should never carry above 20 pounds. [Tr. 444]. Noting that the Plaintiff had Carpal Tunnel Syndrome, the doctor further restricted him to 1-2 hours of simple grasping, 1 hour of fine finger manipulation, and no pushing-pulling in an 8 hour period. [Tr. 444]. The doctor also restricted the Plaintiff's foot control movements to 15-20 minutes in an 8 hour period. [Tr. 444]. The Plaintiff was also restricted to 5-10 cumulative minutes of stair climbing and kneeling, 10-15 cumulative minutes of twisting and reaching, and no stooping (bending), balancing, crouching, or crawling. [Tr. 444]. The doctor also restricted unprotected heights, moving machinery, temperature extremes, chemicals, humidity, excessive noise, and vibration. [Tr. 444].

Plaintiff was examined by Dr. Robert Sedaros, M.D., on July 13, 2009. [Tr. 446]. The doctor noted a history of bilateral numbness of all digits of both hands, which was occasionally worse in the

small and ring fingers. [Tr. 446]. Upon examination, the doctor noted positive Tinel's at the wrist and elbow and positive Phalen's test. [Tr. 446]. The doctor noted no atrophy of the hand, no arthritic processes, and good grip strength. [Tr. 446]. An X-ray examination showed a healed fifth metacarpal fracture. [Tr. 446]. Dr. Sedaros diagnosed bilateral hand parasthesias, which was likely consistent with Carpal Tunnel Syndrome or possibly Cubital Tunnel Syndrome. [Tr. 446]. The doctor recommended a nerve conduction study. [Tr. 446]. The nerve conduction study of both arms and hands was conducted on July 28, 2009. [Tr. 451]. The study yielded an impression of Bilateral Carpal Tunnel Syndrome affecting motor and sensory fibers. [Tr. 451-53]. Dr. Sedaros confirmed the diagnosis of Bilateral Carpal Tunnel Syndrome after a review of the nerve conduction study and discussed surgery with the Plaintiff. [Tr. 454].

On August 25, 2009, the Plaintiff visited with Dr. Brooks. [Tr. 459]. Dr. Brooks noted on the physical examination of the Plaintiff that the latter showed no overt pain behavior, had intact range of motion and strength, ambulated with a gait favoring the right side, and showed minimal tenderness over the posterior cervical spine on the right side and the right shoulder area. [Tr. 459]. The doctor's impression was of (1) worsening neck and upper extremity pain, especially on the right side; (2) Carpal Tunnel Syndrome on the left upper extremity; (3) a history of lumbar fusion L4-S1 with right foot pain consistent with an L4-5 radicular pattern; and (4) Osteoarthritis of the bilateral knees. [Tr. 459]. The doctor ordered an MRI and offered epidural injections. [Tr. 459].

An ultra-high resolution MRI scan of the Plaintiff's cervical spine was taken on September 9, 2009. [Tr. 455]. It showed a reversal of the normal lordotic curvature of the cervical spine. [Tr. 455]. It also showed a mild diffuse posterior concentric bulging annulus with some mild effacement of the subarachnoid space ventrally at the C5-6 range. [Tr. 455]. The C6-7 range showed a mild posterior

-19-

concentric bulging annulus with some mild effacement of the subarachnoid space ventrally. [Tr. 455]. The C2-5 range showed normal height and signal. [Tr. 455]. The cervical chord was normal in signal and morphology. [Tr. 455]. The radiologist noted a straightening of the cervical spine which he opined was consistent with muscle spasm. [Tr. 456]. A cervical epidural steroid injection was performed at the C6-7 interspace with fluoroscopy and an epidurogram on September 16, 2009 by Dr. Brooks. [Tr. 457].

## II.     Specific Issues and Conclusions of Law

The Plaintiff raises four issues on appeal. As stated by the Plaintiff, they are: (1) the ALJ erred in finding that Plaintiff's Carpal Tunnel Syndrome was not severe and his opinion was not based on substantial evidence; (2) the ALJ failed to discuss, assign proper weight, or provide good cause for rejecting the opinions of the examining and treating physicians with regard to the Claimant's residual functional capacity; (3) the ALJ failed to adhere to SSR 96-7 when assessing the Plaintiff's credibility; and (4) the ALJ erred by applying the medical vocational guidelines and in failing to obtain Vocational Expert testimony in light of non-exertional impairments.

### A.     The Plaintiff's Carpal Tunnel Syndrome.

Plaintiff argues that the ALJ erred in finding that the Plaintiff's Carpal Tunnel Syndrome was not severe. He contends that the ALJ erred in determining that the Plaintiff's Carpal Tunnel Syndrome failed to last or was expected to last for a continuous period of at least 12 months. The Commissioner argues that the medical evidence of record provides substantial evidence to support the ALJ's finding that Plaintiff's Carpal Tunnel Syndrome was not severe. The Commissioner further argues that a finding of not severe in step two is a harmless error because step two is a threshold inquiry.

In order to be considered severe for the purposes of step two of the evaluation process, an impairment must meet the duration requirement outlined in 20 C.F.R. § 404.1509. 20 C.F.R. § 404.1520(a)(4)(i). The impairment "must have lasted, or must be expected to last for a continuos period of at least 12 months." 20 C.F.R. § 404.1509. Step two, however, only requires the finding of any severe impairment in order for the claim to go through to the next step. *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). Committing an error at step two can be harmless as long as the ALJ considers the functional limitations of the impairment at later steps of the evaluation. *Zellner v. Astrue*, No. 308-cv-1205-J-TEM, 2010 WL 1258137, at *4 (M.D. Fla. Mar. 29, 2010).

The ALJ found that the Plaintiff's Carpal Tunnel Syndrome was not severe at step two of the evaluation process, determining that the impairment had not lasted for a continuous period of 12 months. [Tr. 20-21]. The ALJ considered the Plaintiff's visits to Dr. Hate in 2007 [Tr. 323], the visit to Dr. Sedaros in 2009 [Tr. 446], and the lack of treatment and evaluation other than what was available in recent records. [Tr. 20-21]. Substantial evidence supports that the ALJ's finding that the impairment had not continuously lasted for 12 months. [Tr. 20-21]. Although Dr. Hate stated that there was evidence of Carpal Tunnel Syndrome in October of 2007 [Tr. 323], the Plaintiff's medical records only show treatment and evaluation again in 2009 when the Plaintiff visited with Dr. Sedaros [Tr. 446]. A gap of almost two years in treatment and evaluation does not suggest the ALJ erred in finding that the Carpal Tunnel Syndrome had not lasted for twelve consecutive months. *Cheney v. Astrue*, No. 2:09–CV–597–FtM–DNF, 2011 WL 845781, at * 3(M.D. Fla. Mar. 8, 2011).

However, 20 C.F.R. § 404.1509 requires either that the impairment has already lasted twelve months or is expected to do so. The Plaintiff contends that because ALJ explicitly addressed only the first part of the regulation in his decision, he erred in finding the impairment not severe. [Tr. 21]. The

-21-

ALJ must provide the court with "sufficient basis to determine that the correct legal principles have been followed." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982). The fact that the ALJ did not explicitly state that the Plaintiff's Carpal Tunnel Syndrome was not expected to last for more than twelve months does constitute an error.

Even if the ALJ erred, a mistake at step two in the sequential evaluation is harmless error because step two is a threshold inquiry. The ALJ found that Plaintiff had severe impairments and moved onto step three of the sequential evaluation. [Tr. 20-22]. As noted above, if the functional limitations of the impairment are discussed at subsequent steps of the evaluation process, failure to find an impairment severe at step two constitutes only a harmless error. The ALJ noted the limitations of the impairment during step three of the evaluation process when he discussed the Plaintiff's residual functional capacity. [Tr. 23-27]. The ALJ discussed the limitations when finding the Plaintiff not credible and able to perform a full range of light work, noting that the Plaintiff played video games, used the computer, and went fishing. [Tr. 25]. The ALJ also discussed Dr. Hate's findings of normal grip strength, no atrophy, and no loss of sensation. [Tr. 25]. The ALJ further accorded little weight to the opinion of Dr. Brooks and his assessment of the Plaintiff's limitations, which included limitations based on Carpal Tunnel Syndrome, [Tr. 443], noting Dr. Hate's findings for support. [Tr. 27]. Therefore, even if the ALJ erred in not finding Plaintiff's Carpal Tunnel Syndrome to be severe at step two, the error was harmless. The Court finds that the ALJ did not commit reversible error at step two of the evaluation process.

**B.      Weight Assigned to Medical Opinions**.

The Plaintiff argues that the ALJ failed to discuss and assign proper weight for rejecting the opinions of examining and treating physicians when reviewing Plaintiff's Residual Functional

Capacity. The Commissioner contends that the ALJ properly considered and evaluated the medical evidence when deciding the Plaintiff's case.

### 1.      Dr. Brooks

First, Plaintiff contends that the ALJ erred in assessing the Plaintiff's residual functional capacity ("RFC") by according Dr. Brooks' medical opinion little weight and not recontacting him to develop a full record, further arguing that the doctor's opinion should be taken as true because of the ALJ's failure to properly refute it. (Doc. 13 p. 19-22). The Commissioner contends that the ALJ properly evaluated the opinion of Dr. Brooks and did not err in according him little weight.

Generally, the opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). "Good cause" exists when the physician's opinion (1) was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records. *Wright v. Barnhart*, 153 F. App'x 678, 684 (11th Cir. 2005).

The ALJ showed the necessary "good cause" in his decision to accord little weight to the opinion of Dr. Brooks. Dr. Brooks restricted the Plaintiff to 3 hours of time working in an 8 hour period. [Tr. 27, 443]. The ALJ held that this opinion was not supported by "medically acceptable clinical findings and laboratory diagnostic techniques" and that it would be accorded little weight. [Tr. 27]. The ALJ refuted Dr. Brooks' assessment by relying on nerve conduction studies, EMG studies, MRI scans, and opinions from Dr. Hate and Dr. O'Brien. [Tr. 27, 297, 321-23, 377, 394, 405, 455].

Dr. O'Brien indicated that Plaintiff had normal examination of the back and neck [Tr. 27, 377, 394, 405]. Dr. Hate noted that the Plaintiff had normal gait, sensation and strength [Tr. 27, 321-23]. Conduction and EMG studies found no evidence of radiculopathy [Tr. 297] and an MRI of the cervical

spine only showed mild disc bulge at two levels [Tr. 455]. Based on this evidence, the ALJ found that, although the Plaintiff did have some restrictions [Tr. 27], the restrictions found in Dr. Brooks' assessment were not supported by the record. Substantial evidence supports the ALJ's findings and his decision to accord Dr. Brooks' opinion little weight.

Furthermore, it was not necessary for the ALJ to recontact Dr. Brooks. The duty to recontact arises if there is insufficient evidence to determine whether the Plaintiff had a disability. *Fries v. Comm'r of Soc. Sec.*, 196 F. App'x 827, 830 (11th Cir. 2006). In this case, there was substantial evidence for the ALJ to make a decision about the Plaintiff's impairments. Therefore, the ALJ did not err in according Dr. Brooks' opinion little weight.

### 2.   Dr. Hate

Second, Plaintiff contends that the ALJ failed to assign any weight to Dr. Nitin Hate's opinion, constituting reversible error. (Doc. 13 p. 18-19). The Commissioner argues that, although the ALJ did not specifically state the weight accorded to Dr. Hate, the language in the ALJ's decision reflects that the doctor was accorded great weight and that his opinion was consistent with the ALJ's findings. (Doc. 15 p. 15).

Where the ALJ does not explicitly state what weight he afforded the opinion of an expert, and that opinion does not contradict the ALJ's findings, the ALJ has only committed a harmless error. *Wright*, 153 F. App'x at 684. The ALJ used Dr. Hate's consultative assessment to refute Dr. Brooks' opinion. [Tr. 25, 27]. The ALJ noted that Dr. Hate's examinations of the Plaintiff indicated only reduced range of motion of the thoracolumbar spine and normal gait, strength, and coordination for gross and fine movements with no muscular atrophy, spasms, or loss of sensation. [Tr. 25]. The ALJ also noted that these findings contradicted Dr. Brooks' assessment of Plaintiff's limitations.

-24-

Although the ALJ did not specify what weight was to be accorded to Dr. Hate's findings, it is clear that the doctor's findings were used to support the ALJ's decision. It is also clear that his opinion was accorded great weight because it was used, along with evidence from Dr. O'Brien [Tr. 377, 394, 405] and laboratory diagnostic techniques [Tr. 297, 455], to refute Dr. Brooks' opinion. The ALJ's failure to explicitly state the weight afforded to Dr. Hate's opinion would at most constitute harmless error.

### 3.     State Agency Physicians

Lastly, the Plaintiff argues that the ALJ afforded significant weight to the opinions of state agency consultants who never examined the claimant. (Doc. 13 p. 22). Plaintiff contends that the reports of state agency consultants taken alone do not constitute substantial evidence. (Doc. 13 p. 22). The Commissioner in turn argues that the ALJ did not solely rely on the state agency opinions and that because these opinions were consistent with the medical evidence, the ALJ did not err in affording them great weight. (Doc. 15 p. 16).

"[R]eports of physicians who do not examine the claimant, taken alone, do not constitute substantial evidence on which to base an administrative decision." *Spencer ex. rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). However, the opinions of non-examining physicians may be accorded greater weight when they are consistent with opinions of examining physicians and the medical evidence in general. *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873 (11th Cir. 2011). Where the ALJ does not rely solely on the opinions of non-examining state agency physicians in making a decision, according significant weight to these opinions would not be erroneous. *Wilkinson v. Comm'r of Soc. Sec.*, 289 F. App'x 384, 386 (11th Cir. 2008).

In this case, the ALJ accorded great weight to the opinions of state agency physicians and psychologists. [Tr. 27, 307, 328, 342, 356]. The ALJ explained that although the medical consultants did not examine Plaintiff, their opinions were based on the medical evidence of record. [Tr. 27]. Furthermore, as outlined above, the ALJ's decision did not depend solely on the opinions of the non-examining physicians. The opinions of the non-examining state agency medical consultants were not accorded undue weight. Accordingly the ALJ did not err in evaluating and weighing these opinions.

Substantial evidence supports the weight accorded to the medical opinions of Dr. Brooks and the state agency medical consultants by the ALJ. Further, not specifically stating what weight was accorded to Dr. Hate at most constitutes harmless error.

### C.     The ALJ Properly Assessed the Plaintiff's Credibility.

The Plaintiff next contends that the ALJ erred in finding that the Plaintiff's statements concerning the intensity, limiting effects, and persistence of his impairments were not credible. (Doc. 13 p. 22-23). Plaintiff argues that his statements are consistent with the record. (Doc. 13 p. 23).

The Eleventh Circuit has used a three part standard to evaluate claimants' subjective pain: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ must give explicit and adequate reasons for discrediting subjective testimony or "the record must be obvious as to the credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).

First, the ALJ "determined whether there [was] an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the Plaintiff's pain or other

symptoms." [Tr. 23]. Second, the ALJ evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." [Tr. 23]. The ALJ concluded that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the . . . residual functional capacity assessment." [Tr. 23].

The ALJ found that the Plaintiff's allegations of total inability to work were not supported by the medical evidence. [Tr. 23]. For example, the ALJ noted that a CT myelogram taken on May 31, 2006 [Tr. 206] showed no evidence of significant canal stenosis or neuroforaminal narrowing. [Tr. 24]. The ALJ also noted that the Plaintiff was responding well to treatments and that visits with Dr. O'Brien and Dr. Hate showed normal gait and strength. [Tr. 25-26]. The Plaintiff reported on October 3, 2008 that the TENS unit he was using had been helpful and that his quality of life had improved because of the medications he was taking. [Tr. 24]. The ALJ also reported that the Plaintiff had canceled an arthoscopic surgery that he was due to have in 2008 and never rescheduled. [Tr. 26]. The ALJ found that the evidence on record was not consistent with the Plaintiff's subjective complaints of pain.

The ALJ also considered the Plaintiff's own statements. The ALJ noted that there were inconsistencies between the Plaintiff's statements in the record and those he made during his hearing. [Tr. 25]. For example, the Plaintiff had reported in his function reports that he could prepare simple meals, help with light housekeeping, and could drive and shop. [Tr. 151-52, 168-70]. At his hearing, however, Plaintiff reported that his wife prepared the meals, did the household chores, and went shopping. [Tr. 56]. The ALJ also noted that some statements were inconsistent with someone who is

disabled. For example, Plaintiff reported that he went fishing, attended his nephew's soccer games about once a week, [Tr. 170-71], used the computer, and played video games. [Tr. 25, 326].   The Plaintiff also reported to Dr. Brooks in October of 2008 that he continues to work. [Tr. 25, 412]. Substantial evidence supports the ALJ's finding that the Plaintiff's statements concerning the intensity, limiting effects, and persistence of his impairments were not credible. The ALJ did not err in these determinations.

### D.    Medical-Vocational Guidelines

Plaintiff contends that the ALJ erred in applying the Medical Vocational Guidelines ("GRIDS") and failing to obtain Vocational Expert Testimony because the Plaintiff had severe nonexertional impairments. (Doc. 13 p. 23). The Commissioner argues that the Plaintiff's nonexertional impairment does not preclude the use of GRIDS. (Doc. 15 p. 22).

At step five of the sequential analysis, the ALJ has the burden to establish that the Plaintiff could perform other work that exists in the national economy. *Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). To do this, the ALJ may rely on the GRIDS or call a vocational expert. *Id.* at 1239-40. The Eleventh Circuit "has recognized that the grids may be used in lieu of vocational testimony on specific jobs if none of the claimant's nonexertional impairments are so severe as to prevent a full range of employment at the designated level." *Passopulos v. Sullivan*, 976 F.2d 642, 648 (11th Cir. 1992).

At step four, the ALJ found that the Plaintiff could do the full range of light work as defined in 20 C.F.R. § 404.1567(b) with postural limitations of occasional ability to climb, balance, stoop, kneel, crouch, or crawl. [Tr. 23-27]. The regulations state that a full range of light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to

10 pounds," and "a good deal of walking or standing or. . . some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The postural limitations outlined by the ALJ do not ordinarily have a significant impact on the broad range of work. SSR 85-15, 1985 WL 56857, at *6-7. The nonexertional impairment of pain in this case does not prevent a full range of employment at the designated level of light work, even when considering the postural limitations. The ALJ's reliance on the GRIDS in lieu of a vocational expert, therefore, was appropriate. The ALJ satisfied his burden at step five and did not err in finding the Plaintiff not disabled.

**III.    Conclusion**

Accordingly, the ALJ's decision is consistent with the requirements of the law and supported by substantial evidence. Therefore, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Chambers in Ft. Myers, Florida this 21st  day of August, 2012.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record